This Opinion is a
Precedent of the TTAB

Mailed: November 22, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

————

Trademark Trial and Appeal Board

————

*In re International Fruit Genetics, LLC*

————

Serial No. 88711192

————

Kimberlee A. Boyle of Richard Law Group, Inc.,
    for International Fruit Genetics, LLC.

Beniam Biftu, Trademark Examining Attorney, Law Office 117,
    Cynthia Tripi, Managing Attorney.

————

Before Lykos, Goodman, and Coggins,
    Administrative Trademark Judges.

Opinion by Lykos, Administrative Trademark Judge:

On December 1, 2019, International Fruit Genetics, LLC ("Applicant") filed an

application to register on the Principal Register the standard character mark IFG for

goods ultimately identified as "Fresh fruits and vegetables; live plants; live trees; live

grape vines; live plant material, namely, live grape vine material, live plant material

and live tree material" in International Class 31.[1] In its application, Applicant claims

---

[1] Application Serial No. 88711192, originally filed under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a), claiming June 3, 2009, as the date of first use anywhere and January 8, 2010, as the date of first use in commerce for International Class 31. To obviate a specimen refusal, Applicant amended the filing basis for its International Class 31 goods to intent-to-

ownership of Registration No. 3771967 for the same standard character mark IFG on the Principal Register for "Live plants, namely, table grape vines, cherry trees" in International Class 31. The registration was issued on April 6, 2010, based on an application filed November 7, 2006, and has been renewed.

Registration was refused under Trademark Act Sections 1, 2, and 45, 15 U.S.C. §§ 1051, 1052, 1127, on the ground that the proposed mark identifies the prominent portion of a varietal name for the identified goods and, thus, does not function as a trademark to indicate the source of Applicant's goods and to identify and distinguish them from others.

Applicant timely filed a notice of appeal. The appeal is fully briefed. For the reasons explained below, we affirm the refusal to register.

## I. Preliminary Issues

### A. Material Attached to Applicant's Brief

Applicant attached to its main brief a photocopy of the entirety of the INTERNATIONAL CONVENTION FOR THE PROTECTION OF NEW VARIETIES OF PLANTS OF DECEMBER 2, 1961, AS REVISED AT GENEVA ON NOVEMBER 10, 1972, ON OCTOBER 23,

---

use under Trademark Act Section 1(b), 15 U.S.C. § 1051(b). *See* September 9, 2020 Response to Office Action, pp. 4-5. The application originally included services which eventually were the subject of a divisional request in International Classes 44 and 45 in "child" Application Serial No. 88983999. *See* "Request to Divide" dated December 16, 2021 and "Notice that Processing of Request to Divide Application is Completed" dated March 29, 2022. The services in Classes 44 and 45 are not part of this appeal.

Citations to the prosecution file refer to the USPTO's Trademark Status & Document Retrieval ("TSDR") case viewer format. Citations to briefs refer to actual page number, if available, as well as TTABVUE, the Board's online docketing system. The number preceding "TTABVUE" corresponds to the docket entry number; the number(s) following "TTABVUE" refer to the page number(s) of that particular docket entry. *See Turdin v. Trilobite, Ltd.,* 109 USPQ2d 1473, 1476 n.6 (TTAB 2014).

1978, AND ON MARCH 19, 1991 (hereinafter referred to as the "UPOV Convention" or "Convention").[2] The Examining Attorney objects to the submission as untimely "new evidence" under Trademark Rule 2.142(d), 37 C.F.R. § 2.142(d).[3]

We need not rule on the objection because the Board may sua sponte take judicial notice of international conventions and treaties. *See, e.g., In re Int'l Watchman, Inc.,* 2021 USPQ2d 1171, at *4 n.5 (TTAB 2021) (Board took judicial notice of the text of the North Atlantic Treaty). The UPOV Convention is an international convention and is publicly available at various sources, including the UPOV website at https://upovlex.upov.int/en/convention.[4] We therefore take judicial notice of the text of the 1991 Act of the Convention and its Explanatory Notes, as well as the publicly available facts on the UPOV website at https://www.upov.int about the Convention and its administration. *Cf.* Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it … can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."). *See, e.g., In re tapio GmbH*, 2020 USPQ2d 11387, at *13 n.46 (TTAB 2020) (Board took judicial notice of 2010 U.S. Census records for the top 1,000 surnames); *see also, United States v. Garcia,* 855 F.3d 615 (4th Cir. 2017) (taking judicial notice of facts on U.S. Citizenship and Immigration Services' ("USCIS") website because it is a

---

[2] Applicant's Appeal Brief, 4 TTABVUE 15-38.

[3] Examining Attorney's Brief, 6 TTABVUE 4. The Examining Attorney mischaracterized the material attached to Applicant's brief, calling it "Chapter VI of Article 20 of the 1991 International Convention for the Protection of New Varieties of Plants Act, Publication No: 221(E)." The attachment is a reprint of the 1991 Act of the Convention in its entirety.

[4] The International Union for the Protection of New Varieties of Plants (UPOV) is an intergovernmental organization with headquarters in Geneva, Switzerland.

governmental source whose accuracy cannot be questioned); *Daniels Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998-99 (9th Cir. 2010) (taking judicial notice of information on two school districts' websites because they were government entities); *Hong v. Rec. Equip., Inc.*, 2019 USPQ2d 410124, at n.3 (W.D. Wash. 2019) (the court may take judicial notice of information published on government website). In view thereof, the Examining Attorney's objection is moot.

## B. Length of Applicant's Appeal Brief

The Examining Attorney also objects to Applicant's main appeal brief, claiming that it is 38 pages in length, thereby exceeding the 25 page limitation as set out in Trademark Rule 2.142(b)(2), 37 C.F.R. § 2.142(b)(2). The Rule provides in pertinent part:

> Without prior leave of the Trademark Trial and Appeal Board, a brief shall not exceed twenty-five pages in length in its entirety, including the table of contents, index of cases, description of the record, statement of the issues, recitation of the facts, argument, and summary.

A review of Applicant's main brief shows that it totals only 13 pages, including the table of authorities, summary of the procedural history, and arguments. The remaining pages consist of a photocopy of the UPOV Convention as discussed above. This extraneous submission does not count against the page limitation as set forth in Trademark Rule 2.142(b)(2). Accordingly, the Examining Attorney's objection is overruled.

## II. Background

Before discussing the varietal name refusal, we provide some background on the UPOV Convention, U.S. patent law, and other statutory frameworks for the

protection of varietal names.

## A. The UPOV Convention[5]

The UPOV Convention was adopted on December 2, 1961, at a diplomatic conference in France, but did not come into force until 1968, following ratification by the United Kingdom, the Netherlands and Germany.[6] The Convention was subsequently revised in 1972, 1978, and 1991 to reflect technological advances in plant breeding.[7] The United States is a signatory to the 1991 Act of the Convention.[8] UPOV's stated mission "is to provide and promote an effective system of plant variety protection, with the aim of encouraging the development of new varieties of plants, for the benefit of society."[9] As per the terms of the Convention, its permanent administrative bodies are the Council and Office of the Union, headquartered in Geneva, Switzerland,[10] which receive guidance from various technical,

---

[5] The United States is also obligated to protect plant varieties under Article 27.3(b) of the AGREEMENT ON TRADE RELATED ASPECTS OF INTELLECTUAL PROPERTY ("TRIPs"), which states, in relevant part, that "Members shall provide for the protection of plant varieties either by patents or by a sui generis system or by a combination thereof." The United States implemented the TRIPs agreement with the passage of the Uruguay Round Agreements Act ("URAA"), Pub.L. No. 103-465, 108 Stat. 4809 (1994).

[6] UPOV website, https://upovlex.upov.int/en/convention. *See also* MANUAL OF PATENT EXAMINING PROCEDURE ("MPEP") § 1612 ("UPOV Convention") (June 2020 Publication of Revision 10.2019).

[7] UPOV website, https://upovlex.upov.int/en/convention. *See also* MPEP § 1612.

[8] MPEP § 1612.

[9] UPOV website, https://www.upov.int/portal/index.html.en. *See also* UPOV Convention, Preamble, March 19, 1991, https://www.upov.int/edocs/pubdocs/en/upov_pub_221.pdf.

[10] UPOV Convention, Ch. VIII ("The Union"), art. 24(3), art. 25, art. 26 and art. 27, March 19, 1991, https://www.upov.int/edocs/pubdocs/en/upov_pub_221.pdf.

administrative and legal committees.[11]

The UPOV Convention sets out the framework and requirements for contracting parties to provide protection for new varietal names through the grant of an intellectual property right, called the "breeder's right," to either "the person who bred, or discovered and developed, a variety," or the employer thereof.[12] To be eligible for protection under a breeder's right, the variety must be (i) new, (ii) distinct from existing, commonly known varieties, (iii) uniform, and (iv) stable.[13] The governmental authority of each contracting party is charged with evaluating applications for breeder's rights.[14] The application must set forth "a [varietal] denomination which will be its generic designation,"[15] and the chosen denomination "must enable the variety to be identified."[16] The chosen varietal name cannot "consist solely of figures except where this is an established practice for designating varieties."[17] "Prior rights of third persons shall not be affected [by the designation of a varietal denomination]. If, by reason of a prior right, the use of the denomination of a variety is forbidden to

---

[11] UPOV website, https://www.upov.int/about/en/organigram.html.

[12] UPOV Convention, Ch. I ("Definitions"), art. 1(iv) and art. (v), March 19, 1991, https://www.upov.int/edocs/pubdocs/en/upov_pub_221.pdf .

[13] UPOV Convention, Ch. III ("Conditions for the Grant of the Breeder's Right"), art. 5, March 19, 1991, https://www.upov.int/edocs/pubdocs/en/upov_pub_221.pdf.

[14] UPOV Convention, Ch. IV ("Application for the Grant of the Breeder's Right"), March 19, 1991, https://www.upov.int/edocs/pubdocs/en/upov_pub_221.pdf.

[15] UPOV Convention, Ch. VI ("Variety Denomination"), art. 20(1)(a), March 19, 1991, https://www.upov.int/edocs/pubdocs/en/upov_pub_221.pdf.

[16] UPOV Convention, Ch. VI ("Variety Denomination"), art. 20(2), March 19, 1991, https://www.upov.int/edocs/pubdocs/en/upov_pub_221.pdf.

[17] UPOV Convention, Ch. VI ("Variety Denomination"), art. 20(2), March 19, 1991, https://www.upov.int/edocs/pubdocs/en/upov_pub_221.pdf.

a person who, in accordance with the provisions of paragraph (7),[18] is obliged to use it, the authority shall require the breeder to submit another denomination for the variety."[19] The UPOV Convention provides a minimum term of protection of 20 years for new and distinct plant varieties, and 25 years for trees and vines.[20]

As noted above, the Convention mandates that chosen variety denominations be different from an existing variety of the same plant species or a closely related species, and "not be liable to mislead or to cause confusion concerning the characteristics, value or identity of the variety or the identity of the breeder."[21] To facilitate adherence to this requirement, UPOV maintains an online database with data on plant varieties from UPOV Member States and the Organization for Economic Co-operation and Development (OECD) known as the PLUTO PLANT VARIETY DATABASE.[22] The PLUTO PLANT VARIETY DATABASE allows users to conduct a preliminary search to verify whether a denomination may be confusingly similar to the denominations of existing varieties of the same "Variety Denomination Class."[23]

---

[18] Article 20(7) of the UPOV Convention provides that "[a]ny person who, within the territory of one of the Contracting Parties, offers for sale or markets propagating material of a variety protected within the said territory shall be obliged to use the denomination of that variety, even after the expiration of the breeder's right in that variety, except where, in accordance with the provisions of paragraph (4), prior rights prevent such use."

[19] UPOV Convention, Ch. VI ("Variety Denomination"), art. 20(4), March 19, 1991, https://www.upov.int/edocs/pubdocs/en/upov_pub_221.pdf.

[20] UPOV Convention, Ch. V ("Rights of the Breeder"), art. 19, March 19, 1991, https://www.upov.int/edocs/pubdocs/en/upov_pub_221.pdf.

[21] UPOV Convention, Ch. VI ("Variety Denomination"), art. 20(2), March 19, 1991, https://www.upov.int/edocs/pubdocs/en/upov_pub_221.pdf.

[22] UPOV website, https://www.upov.int/pluto/en.

[23] *Id*. *See also* UPOV Convention, Ch. VI ("Variety Denomination"), art. 20, March 19, 1991, https://www.upov.int/edocs/pubdocs/en/upov_pub_221.pdf; Explanatory Notes 2.5.3 and 2.6

The types of records and intellectual property rights that are included in the PLUTO

PLANT VARIETY DATABASE are:

- Plant Breeders' Rights (PBR)

- Plant Patents (PLP)

- Patents for Inventions (PAT)

- National Lists (NLI)

- Other (explained by each contributor)[24]

Consistent with its mission, the UPOV Convention also requires each member state to ensure that "no rights in the designation registered as the denomination of the variety **shall hamper the free use of the denomination in connection with the variety, even after the expiration of the breeder's right**."[25] The Convention also takes into account trademark rights, insofar as it provides that "[w]hen a variety is offered for sale or marketed, it shall be permitted to associate a trademark, trade name or other similar indication with a registered variety denomination," on the condition that "the denomination must nevertheless be easily recognizable."[26]

---

on Variety Denominations under the UPOV Convention, adopted by the Council on September 21, 2021, https://www.upov.int/edocs/expndocs/en/upov_exn_den.pdf.

[24] UPOV website, https://www.upov.int/pluto/en/termsuse.html.

[25] UPOV Convention, Ch. VI ("Variety Denomination"), art. 20(1)(b), March 19, 1991, https://www.upov.int/edocs/pubdocs/en/upov_pub_221.pdf (emphasis added).

[26] UPOV Convention, Ch. VI ("Variety Denomination"), art. 20(8), March 19, 1991, https://www.upov.int/edocs/pubdocs/en/upov_pub_221.pdf.

### B. U.S. Implementation of the UPOV Convention and U.S. Plant Patent Protection

The UPOV Convention is not self-executing;[27] under U.S. law, it is implemented by the Plant Variety Protection Act, as amended.[28] Plant Variety Protection ("PVP") Certificates are issued by the Plant Variety Protection Office, or PVPO, of the U.S. Department of Agriculture.[29] PVP Certificates were originally only available for seed propagated plants, i.e., sexually reproduced varieties; however, the Agriculture Improvement Act of 2018, Pub. L. 115-334 (commonly known as the 2018 Farm Bill), amended the Agricultural Marketing Act of 1946 to permit PVP certificates to be granted for asexually reproduced varieties.[30] Consistent with the UPOV Convention, PVP certificates protect plant varieties for 20 years and 25 years for vines and trees.[31]

The United States also provides two additional types of intellectual property protection for plant varieties: plant patents and plant-utility patents, both issued by the U.S. Patent and Trademark Office.[32] U.S. plant patent protection predates the Convention.[33] As a result, the United States invoked a reservation to the Convention

---

[27] UPOV Convention, Ch. IX ("Implementation of the Convention"), art. 30, March 19, 1991, https://www.upov.int/edocs/pubdocs/en/upov_pub_221.pdf.

[28] 7 U.S.C., Ch. 57, §§ 2321-2583. *See* H.R. REP. NO. 103–699, at 1 (1994), reprinted in 1994 U.S.C.C.A.N. 2423, 2423.

[29] 7 U.S.C., Ch. 57, §§ 2321-2583.

[30] Public Law 115-334, at Sect. 10108.

[31] *Id.*

[32] *See* 35 U.S.C. §§ 1 *et seq*. (Consolidated Patent Laws as of December 2004); *see also* MPEP § 1601.

[33] *See* Plant Patent Act of 1930. The plant patent provisions were separated from the utility patent provisions in the Patent Act of 1952 to create 35 U.S.C. § 161 ("Patents for plants"). 35 U.S.C. § 161 was amended in 1954 to extend protection to "newly found seedlings," provided they were found in a cultivated state, but did not otherwise alter the scope of plant

under Article 35(2) to account for the allowance of patent protection for plants.[34] Each type of patent has a term of 20 years from the filing date of the application.[35] Plant patent protection is available only to new and distinct plant varieties that are reproduced asexually, such as fruit trees and berry plants, and not to seed-reproduced varieties.[36] By contrast, plant-utility patents can be used to protect novel plant varieties, whether they are produced sexually or asexually, for genes, traits, methods, plant parts, and the like.[37]

In terms of the USPTO's examination process for plant patent applications, consistent with U.S. obligations under the UPOV Convention, the specification for a plant patent that has been asexually reproduced must set forth, among other items, the "Latin name of the genus and species of the plant claimed" and the "variety denomination."[38] Otherwise, "the disclosure in the application will be objected to."[39] Section 1612 of the MANUAL OF PATENT EXAMINING PROCEDURE ("MPEP") (June 2020

---

patent protection. In *In J.E.M. AG Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 60 USPQ2d 1865 (2001), the U.S. Supreme Court affirmed the USPTO's practice of granting utility patent protection for plant inventions. For further information on the history of plant patent protection, see MPEP § 1601.

[34] MPEP § 1612.

[35] 35 U.S.C. § 120, 121 and 365(c). *See* MPEP § 2701.

[36] 35 U.S.C. § 161 ("Whoever invents or discovers and asexually reproduces any distinct and new variety of plant, including cultivated sports, mutants, hybrids, and newly found seedlings, other than a tuber propagated plant or a plant found in an uncultivated state, may obtain a patent therefor, subject to the conditions and requirements of this title.").

[37] *See* 35 U.S.C. §§ 1 *et seq.* (Consolidated Patent Laws as of December 2004).

[38] *See* 35 U.S.C. § 162 ("No plant patent shall be declared invalid for noncompliance with section 112 if the description is as complete as is reasonably possible."); *see also* 37 C.F.R. §§ 1.163(c)(4) and (5) and MPEP §§ 1605 and 1613.

[39] *See* 37 C.F.R. §§ 1.121(e) and 1.163(c)(4); *see also* MPEP § 1613.

Publication of Revision 10.2019) further explains this requirement, as well as the relationship between U.S. plant patent examination and obligations under the UPOV Convention:

> **Application of the UPOV Convention in the United States does not affect the examination of plant patent applications, except in one instance. It is now necessary as a condition for receiving a plant patent to register a variety denomination for that plant. Inclusion of the variety denomination in the patent comprises its registration**. The registration process in general terms consists of inclusion of a proposed variety denomination in the plant patent application. The examiner must evaluate the proposed denomination in light of UPOV Convention, Article 13. Basically, this Article requires that the proposed variety denomination not be identical with or confusingly similar to other names utilized in the United States or other UPOV member countries for the same or a closely related species. In addition, the proposed denomination must not mislead the average consumer as to the characteristics, value, or identity of the patented plant. Ordinarily, the denomination proposed for registration in the United States must be the same as the denomination registered in another member state of UPOV.

Emphasis added. For further information regarding plant patent examination, *see* MPEP Chapter 1600.

### III. Refusal — Varietal or Cultivar Names

We now direct our attention to the substantive refusal before us. In the seminal case *In re Pennington Seed Co.*, 466 F.3d 1053, 80 USPQ2d 1758, 1761-62 (Fed. Cir. 2006), the U.S. Court of Appeals for the Federal Circuit upheld as valid the USPTO's long-standing precedent and practice of treating varietal names as generic. In affirming the Board's determination that the term "Rebel," as a varietal name for a type of grass seed, failed to function as a mark, the Court remarked:

> While the TMEP is not established law, but only provides instructions to examiners, it does represent the PTO's established policy on varietal names that is entitled to our respect. We see no reason to differ with it. *See W. Fla. Seafood, Inc. v. Jet Rests., Inc.*, 31 F.3d 1122, 1127 n. 8 (Fed. Cir. 1994) ("While the TMEP does not have the force and effect of law, it sets forth the guidelines and procedures followed by the examining attorneys at the PTO.").

*Id. See also Dixie Rose Nursery v. Coe*, 131 F.2d 446, 55 USPQ 315, 316 (D.C. Cir. 1942) ("The Patent Office and the District Court might properly conclude that the words 'Texas Centennial,' though originally arbitrary, have come to describe to the public a rose of a particular sort, not a rose from a particular nursery."), *cert. denied*, 318 U.S. 782 (1943). According to TRADEMARK MANUAL OF EXAMINING PROCEDURE ("TMEP") § 1202.12 (July 2022), "[v]arietal or cultivar names are designations given to cultivated varieties or subspecies of live plants or agricultural seeds. They amount to the generic name of the plant or seed by which such variety is known to the U.S. consumer." *Accord Pennington Seed*, 80 USPQ2d at 1761-62 (affirming Board ruling that applicant cannot claim as a trademark the varietal name for plant seed even if it created genus) (internal citation omitted). *See, e.g., In re Hilltop Orchards & Nurseries, Inc.*, 206 USPQ 1034 (TTAB 1979) (Board affirmed refusal to register the varietal name "Commander York" as a trademark for apple trees); *In re Farmer Seed & Nursery Co.*, 137 USPQ 231 (TTAB 1963) (refusing registration of the name "Chief Bemidji" as a trademark for a strawberry plant); *In re Cohn Bodger & Sons Co.*, 122 USPQ 345 (TTAB 1959) (refusing registration of the varietal name "Blue Lustre" as a trademark for hybrid petunia seeds). "Likewise, if the mark identifies the prominent portion of a varietal name, it must be refused." TMEP § 1202.12 (citing *In*

*re Delta & Pine Land Co.*, 26 USPQ2d 1157 (TTAB 1993) (affirming the refusal to register DELTAPINE, which was a portion of the varietal names Deltapine 50, Deltapine 20, Deltapine 105 and Deltapine 506)). "It is against public policy for any one supplier to retain exclusivity in a patented variety of plant, or the name of a variety, once its patent expires." TMEP § 1202.12*; accord Pennington Seed*, 80 USPQ2d at 1762.

TMEP Section 1202.12 provides the following instructions for examining attorneys:

> Whenever an application is filed to register a mark containing wording for live plants, agricultural seeds, fresh fruits, or fresh vegetables, a search using Internet search engines does not by itself suffice to assess whether the mark is a varietal or cultivar. Unless a Note to the File in the record indicates that a separate search by the Trademark Law Library was conducted, the examining attorney must submit a request to the Trademark Law Library to undertake an independent investigation of any evidence that would support a refusal to register, using sources of evidence that are appropriate for the particular goods specified in the application (e.g., laboratories and repositories of the United States Department of Agriculture, plant patent information from the USPTO, a variety name search of plants certified under the Plant Variety Protection Act listed at www.ars-grin.gov/npgs/searchgrin.html ).

The Federal Circuit also explained in *Pennington Seed* that an entity that is the source of a varietal wishing to use a particular term as a trademark for its specific varietal is not prohibited from doing so, however, it must be clear that there is also a generic name for the varietal:

> We do not of course hold that an applicant is precluded from acquiring trademark protection for a particular variety of grass seed. If an applicant wishes to establish

trademark protection for its variety of grass seed, it can do so by associating a particular brand name with its grass seed. However, having designated the term "Rebel" as the varietal name for grass seed and having failed to associate any additional word with the Rebel grass seed that would indicate the seed's source, Applicant here is prohibited from acquiring trademark protection for the generic and only name of that variety of grass seed. This situation may be contrasted with pharmaceutical products where a generic name is designated for a new pharmaceutical product and its manufacturer associates it with a brand name. For example, ibuprofen is the generic term designated for a particular nonsteroidal anti-inflammatory drug and ADVIL is a brand name indicating a source of the drug. Trademark protection does not inure to the generic name there and it does not do so here.

*Pennington Seed*, 80 USPQ2d at 1762. This notion reflects the Board's earlier decisions that if the term is used as a designation of source (i.e., a trademark) and there is a different varietal designation, the term may be registrable. *See, e.g., In re Cole Nursery Co., Inc.*, 178 USPQ 424, 424-25 (TTAB 1973) (Board reversed refusal to register TALLHEDGE as a varietal name; "[a] page from applicant's Spring 1972 Trade List shows that 'TALLHEDGE' is used as an identification of source and, 'Rhamnus frangula 'Columnaris'' as a varietal designation"). The Board further explained this principle in *In re Stark Bro's Nurseries & Orchards Co.*, 132 USPQ 652, 653 (TTAB 1962) in which the refusal to register STARKRIMSON as a varietal name was reversed because the proposed designation was used as a trademark and was not part of the patented plant varietal name:

According to the evidence filed by applicant, it is a common practice in the nursery field to attach to a tree or a plant which is the subject of plant patent a special tag or label bearing both the usual statutory patent notice and the trademark adopted and used for such product; the varietal names for the apple, pear and strawberry trees and plants

> on or in connection with which applicant uses the designation "STARKRIMSON" are "Bisbee Apple", "Kalle Pear", and "Christ Strawberry", respectively; and in addition to these varietal names, applicant, in its catalogues, always uses the term "STARKRIMSON" to identify these particular products. It is, moreover, incongruous, to say the least, to suppose that a single designation, such as "STARKRIMSON", would or could be used and be considered in the trade or by the purchasing public as a varietal name for three distinctly different types of plants and/or trees. …Only one conclusion can be adduced from the record herein and that is "STARKRIMSON" is being used by applicant as a trademark to identify its fruit trees and plants and to distinguish them from like goods sold by others.

With this in mind, we now look to the evidence of record and arguments presented to ascertain whether IFG fails to function as a trademark for the identified goods.

### A. Examining Attorney's Arguments and Evidence

The Examining Attorney argues that this appeal falls squarely under the purview of TMEP Section 1202.12 which states that "if the mark identifies the prominent portion of a varietal name, it must be refused," citing *In re Delta & Pine Land Co., supra.* In that case, the Board affirmed the refusal to register the proposed mark DELTAPINE for "agricultural planting seeds" under Section 2(e)(1) of the Trademark Act as merely descriptive because that term is "the prominent part of various varietal names for plants or seeds, some of which are sold under the asserted mark." *Id*. at 1158. The evidence showed that Deltapine 50, Deltapine 20, Deltapine 105 and Deltapine 506 were varietal denominations given to new varieties of cotton and soybean in applications for PVP certificate protection filed with the PVPO under the Plant Variety Protection Act.

The Examining Attorney views *In re Delta & Pine Land Co.* as "instructive of the USPTO's policy to refuse registration of a trademark if the words sought for registration as a mark for live plants or agricultural seeds comprise[] a varietal or cultivar name."[40] To support the refusal that Applicant's proposed mark IFG identifies the prominent portion of varietal names for "Fresh fruits and vegetables; live plants; live trees; live grape vines; live plant material, namely, live grape vine material, live plant material and live tree material," the Examining Attorney made of record the following evidence:

● A printout from the PLUTO PLANT VARIETY DATABASE indicating that "IFG" is an element in numerous varietal names designated in plant breeder's rights (PBR), and plant patents (PLP) for grapes, grapevines, grapevine plants, sweet cherry trees and cherries.[41] Examples include "IFG FOUR," "IFG FIVE," "IFG SIX," "IFG SEVEN," "IFG EIGHT," and "IFG NINE."[42] During prosecution, Applicant acknowledged that the UPOV database results show that the varietal denominations "are prefaced with the acronym 'IFG'" and that "[t]hese varieties are all the subject of registered or applied for plant patents and/or utility patents and/or other forms of plant variety rights overseas."[43] For purposes of our decision, we have only considered

---

[40] Examining Attorney's Brief, 6 TTABVUE 6, n.4.

[41] Denomination search results for "IFG" from the PLUTO PLANT VARIETY DATABASE, www3wipo.int/pluto/user/en/index.jsp, (last visited January 7, 2020 8:46 AM) submitted with June 17, 2021 Final Office Action, TSDR pp. 4-6.

[42] *Id.*

[43] Applicant's response to the Examining Attorney's information request pursuant to Trademark Rule 2.61(b), 37 C.F.R. § 2.61(b) inquiring "Whether IFG has ever been used or will be used in connection with a plant patent, utility patent, or certificate for plant-variety protection." *See* March 9, 2020 Office Action and Applicant's September 9, 2020 Response.

below the results for plant patents and plant breeder's rights (i.e. PVP certificates) issued in the United States. The full search results from the PLUTO PLANT VARIETY DATABASE are reprinted in Appendix I.

- Printouts of U.S. Plant Patent Nos. P23315, P23531, P24583, and P25434 showing that IFG is the initial portion of the designated "Varietal Denomination" on the following plant patents owned by Applicant; reprinted in Appendix II:[44] In relevant part each patent states:

> "IFG Ten" for "[a] new and distinct grapevine variety … characterized by producing large, very crisp, oval green seedless berries borne on medium size clusters. The fruit ripen and are commercially harvestable in mid-season."[45]
>
> "IFG Six" for "a new and distinct grapevine variety denomination … characterized by producing naturally large, extremely elongated, narrow diameter, crisp seedless black berries having a distinct dimple on the distal end. The fruit ripen and are commercially harvestable from late-August to mid-September. Berries color to full black and store well."[46]
>
> "IFG Eight" for "a new and distinct grapevine variety denomination … characterized by producing crisp oval, seedless fruits which are fully black in color and ripen early in the growing season."[47]
>
> "IFG Sixteen" for "a new and distinct grapevine variety denomination … characterized by producing naturally

Applicant qualified its answer by stating that "[t]he acronym "IFG" stands for "International Fruit Genetics, LLC," the registered holder of all such registered rights. *See id.*

[44] *See* U.S. Plant Patent Nos. P23315, P23531, P24583, and P25434, https://patentimages.storage.googleapis.com (last visited June 16, 2021, 4:08:55 PM, 4:09:36 PM, 4:11:00 PM, and 4:11:39 PM) submitted with June 17, 2021 Final Office Action, TSDR pp. 5-8. Applicant is listed as the assignee on each plant patent.

[45] *Id.* at 5.

[46] *Id.* at 6.

[47] *Id.* at 7.

large, ovate to slightly elongated ovate, black seedless berries which are medium firm in texture and ripen late in the growing season. Fruits normally ripen mid to late September near Delano, Calif."[48]

● Search results from the online database JUSTIA PATENTS SEARCH for "Patents Assigned to International Fruit Genetics, LLC" showing Applicant's plant patents for new and distinct varietal denominations of grapevines and sweet cherry trees with a given nomenclature incorporating the term "IFG;" reprinted in Appendix III.[49] Most of these varietal names follow the same naming convention of a numerical designation preceded by "IFG" (e.g., "IFG Thirty-four," "IFG Thirty-five," and "IFG Forty").[50] Others follow a slightly different pattern of IFG followed by a shortened form suggestive of the named tree or fruit (i.e. "cher" for "cherry") hyphenated with a number. Such examples include:

> "IFG Cher-seven" denoting "a new and distinct sweet cherry tree variety … characterized by producing large size, dark red fruits having reniform shape and ripening mid-season. The eating quality remains good after 40 days of cold storage. The fruit stems of 'IFG Cher-seven' remain green, have fresh appearance, and have excellent attachment;"

> "IFG Cher-five" for "a new and distinct sweet cherry tree variety … characterized by producing large size dark red fruits having flat-round shape…The 'IFG Cher-five' has firm medium acid fruit with an excellent cherry flavor. Fruits are tolerant of rain induced cracking, and high temperature induced doubling;" and

---

[48] *Id.* at 8.

[49] "Patents Assigned to International Fruit Genetics," JUSTIA PATENTS SEARCH (updated as of June 7, 2020), https://patents.justia.com/assignee/international-fruit-genetics-llc, (last visited June 16, 2021) submitted with June 17, 2021 Final Office Action, TSDR pp. 9-12.

[50] *Id.*

"IFG Cher-ten" to identify "a new and distinct sweet cherry tree variety … characterized by producing large size, dark red fruits having reniform shape and ripening mid-season. Fruits ripen early, are firm with medium acidity and have a good cherry flavor. Fruit stems are long, medium thick, have a strong attachment and stay green during storage and shipping. … The tree has medium-low chilling requirement of about 400 to 500 hours. …"[51]

The Examining Attorney submits that each category of evidence summarized above shows that Applicant's proposed mark IFG is the prominent portion of numerous varietal denominations for the identified goods because it is "the first and dominant term most likely to be remembered by the purchaser compared to the second term which are merely consecutive numeric designations."[52] For this reason, Applicant's IFG mark cannot function as a trademark to indicate the source of Applicant's identified products. Otherwise, the Examining Attorney concludes, to permit allowance of Applicant's proposed mark would contravene the public policy of prohibiting any one breeder or supplier from retaining exclusivity in the name of a variety once the patent, PVP certificate, or breeder's right expires.

### B. Applicant's Arguments

Applicant counters that its proposed mark IFG is capable of functioning as a source indicator for the identified goods. Applicant views *In re Delta & Pine Land Co., supra,* as not presenting an absolute bar to registration of marks comprised in prominent part of varietal names. Rather, Applicant argues that evidence of consumer perception as a source indicator could potentially obviate the refusal.

---

[51] *Id.*

[52] Examining Attorney's Brief, 6 TTABVUE 8.

Applicant couches *In re Delta & Pine Land Co.* as "[setting] the stage for Applicant to illustrate the acquisition of secondary meaning and show that the IFG mark is distinguished from the varietal names."[53] The discussion Applicant refers to is the following:

> [W]e point out that we have decided this case on the rather scant record before us. We note, for example, that there is simply no support for applicant's statement that the asserted mark is understood in the trade and by the purchasers as a source indicator for different kinds of agricultural seeds, as distinguished from its use with various numerals as plant varietal names. Such evidence (affidavits or declarations) showing how the asserted mark is actually perceived and that it is distinguished from the varietal names by the relevant public would have been helpful to applicant's case.

26 USPQ2d at 1159. Consistent with this line of reasoning, Applicant maintains that the relevant consumers, Applicant's grower licensees and fruit retailers, recognize IFG as a source indicator for Applicant's plant products, regardless of whether a particular fruit or other product is covered by a plant patent. Applicant points to its ownership and use of a valid and subsisting, "incontestable" registration for the same trademark, IFG, for legally identical goods consisting of "live plants, namely table grape vines, cherry trees," which was obtained prior to the issuance of any of its plant patents incorporating IFG as part of a varietal name. Without evidentiary support, Applicant further argues that its use of IFG, an abbreviation for its trade name, for over two decades as both a trademark and house mark for other products and services supports a finding that IFG is not a varietal name. Applicant also touts its reputation

---

[53] Applicant's Brief, p. 8; 4 TTABVUE 9.

as "the world's leading premium fruit-breeding company, internationally recognized for its top quality, non-GMO fruit varieties in the table grape, cherry, and raisin industries," as proof that consumers recognize IFG as a trademark denoting "the quality and uniqueness" of its products as opposed to a generic varietal name.[54]

Turning to the evidence the Examining Attorney submitted to support the refusal, Applicant observes that none of the varietal names are for the initialism IFG alone; rather, each varietal denomination is comprised of the term IFG followed by a numerical designation. Applicant characterizes the Examining Attorney as being "stuck in an inapposite interplay between the plant patent varietal names, UPOV, and trademark law."[55] Elaborating on the purported deficiencies of the evidentiary record, Applicant contends that

> [T]he Examining Attorney bases his refusal on the argument that "IFG" is the dominant portion of the varietal name, trying to apply trademark law principles to plant patents and the UPOV. Applicant asserts that the Examining Attorney must balance the requirements of the UPOV, the Patent Office being comfortable with the common IFG brand element across plant patent names for different fruit varieties, and trademark law and market reality.[56]

Applicant further argues that it is in full compliance with the UPOV Convention (and in particular Sections 2, 7 and 8 of Article 20) because none of the varietal denominations from the PLUTO database or listed in the U.S. plant patents are

---

[54] Applicant's Appeal Brief, p. 9; 4 TTABVUE 10. Applicant cites to a summary judgment decision from 2011, *Gerawan Farming, Inc. v. Prima Bella Produce, Inc.,* 2011 WL 6 3348056 (E.D. Cal. 2011) which is not controlling here.

[55] Applicant's Appeal Brief, p. 10; 4 TTABVUE 11.

[56] *Id.*

comprised solely of the initialism IFG. Rather, as Applicant explains, it made a deliberate decision to use IFG coupled with a number as the designation for new varietal names in order to simultaneously satisfy the requirements under the UPOV Convention and U.S. plant patent law, while also serving as a source indicator of International Fruit Genetics as the breeder. To find that IFG fails to function as a trademark "would mean that nothing other than the first varietal name registered with the source indicator 'IFG' in it could ever satisfy UPOV Article 20 Section 2."[57]

Lastly, Applicant disagrees with the Examining Attorney's public policy concern that to allow IFG to register as a trademark for the identified goods would be tantamount to an improper extension of the plant patent and PVP certificate rights:

> When one of Applicant's plant patents expires, IFG will lose the ability to prevent a third party from using that plant patent varietal name to refer to the same varietal formerly registered under that name. The UPOV and plant patent law already provide for that as to the particular varietal, and trademark law need not be overlaid in a situation where – as here – the house brand already serves as a source indicator of all goods and services from Applicant, not just the varietals protected by the plant patents.

> And again, IFG's use of IFG in the trademark sense as a source indicator and as a required element (also as a source indicator) of the varietal name under the UPOV means that IFG's trademark rights are rooted in the IFG mark versus in the use of one of the many varietal names whether during the life of the plant patent or thereafter. …As the plant patents for each denomination expire, IFG will have new breeds in its portfolio. Thus, even if the varietal denomination "twenty three" that the growers wanted to license because it was an IFG grape or cherry

---

[57] Applicant's Brief, p. 11; 4 TTABVUE 12.

breed became public domain, the IFG mark itself would not
stop functioning as a trademark.[58]

## C. Analysis

The Examining Attorney's evidence unequivocally shows that the initialism IFG is the first component of numerous varietal names for grapes, grapevines, grapevine plants, sweet cherry trees and cherries. These agricultural and produce products are encompassed within the scope of Applicant's goods in the application broadly identified as "Fresh fruits and vegetables; live plants; live trees; live grape vines; live plant material, namely, live grape vine material, live plant material and live tree material." *See, e.g., In re Hughes Furniture Indus., Inc.*, 114 USPQ2d 1134, 1137 (TTAB 2015) ("Applicant's broadly worded identification of 'furniture' necessarily encompasses Registrant's narrowly identified 'residential and commercial furniture.'"). We therefore agree with Applicant's assertion that IFG, standing alone, is not the entire varietal name for the identified goods.

Thus, the questions before us are: (1) is the prominent portion of a varietal name barred from registration under Trademark Act Sections 1, 2, and 45 because varietal names are the equivalent of generic designations; (2) if so, does the record show that IFG is a prominent portion of the varietal names of record for the identified goods; and (3) does this constitute an absolute bar to registration given Applicant's prior valid and subsisting trademark registration of the same mark for "Live plants, namely, table grape vines, cherry trees" where such registration issued prior to the

---

[58] *Id.* at 12; 4 TTABVUE 13.

application filing dates of any of the plant patents or plant breeder's rights (i.e. PVP certificates under U.S. law) and purported prior trademark use?

> **1.    Is the Prominent Portion of a Varietal Name Barred from Registration under Trademark Act Sections 1, 2, and 45 because it is the equivalent of a generic designation?**

As explained above, in *In re Pennington Seed Co., supra,* the Federal Circuit affirmed the Board's long standing practice that an applicant cannot register as a trademark the varietal name for a live plant, seed, vegetable or fruit, even if it created or invented the genus and the varietal name. 80 USPQ2d at 1761-62. According to TMEP Section 1202.12, the USPTO applies this practice to prohibit the registration of marks that identify the prominent portion of a varietal name under Trademark Act Sections 1, 2, and 45 as failing to function as a source indicator because varietal names are the equivalent of generic terms. The underlying rationale is the same – to prevent monopolies and foster competition:

> Generic terms, by definition incapable of indicating source, are the antithesis of trademarks, and can never attain trademark status. The reason is plain: To allow trademark protection for generic terms, i.e., names which describe the genus of goods being sold, even when these have become identified with a first user, **would grant the owner of the mark a monopoly**, since a competitor could not describe his goods as what they are.

*Pennington Seed*, 80 USPQ2d at 1762 (quoting *In re Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 828 F.2d 1567, 4 USPQ2d 1141, 1142 (Fed. Cir. 1987)) (emphasis added).

The logic of *Pennington Seed* applies with equal force here. Granting an applicant a trademark registration for the prominent portion of a varietal name would be

anticompetitive since it would be allowing one entity to have exclusive trademark rights in a generic term.

We therefore hold that proposed marks which constitute the prominent portion of a varietal denomination are appropriately refused registration under Trademark Act Sections 1, 2, and 45 because such marks are varietal names, which are the equivalent of generic terms, and thus are incapable of functioning as source indicators and acquiring distinctiveness under Section 2(f) of the Trademark Act, 15 U.S.C. § 1052(f). Nor are such marks eligible for registration on the Supplemental Register pursuant to Sections 23-26 of the Trademark Act, 15 U.S.C. §§ 1091-94.

Our holding that the prominent portion of a varietal name cannot be registered as a trademark is consistent with U.S. obligations under the UPOV Convention. When interpreting a treaty, we "first look to its terms to determine its meaning." *United States v. Alvarez–Machain*, 504 U.S. 655, 663 (1992). In construing a treaty, the terms thereof are given their ordinary meaning in the context of the treaty and are interpreted, in accordance with that meaning, in the way that best fulfills the purposes of the treaty. *See United States v. Stuart*, 489 U.S. 353, 365-66 (1989) (interpreting a treaty to carry out the intent or expectations of the signatories); *Kolovrat v. Oregon*, 366 U.S. 187, 193-94, (1961) (a treaty should be interpreted to carry out its purpose). When the text is ambiguous or unclear, we turn to "nontextual sources for guidance." *See United States v. Li*, 206 F.3d 56, 63 (1st Cir. 2000) (en banc); *Tabion v. Mufti*, 73 F.3d 535, 537–538 (4th Cir.1996). "[T]o ascertain their meaning we may look beyond the written words to the history of the treaty, the

negotiations, and the practical construction adopted by the parties." *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 431-432 (1943). When looking at nontextual sources, we are reminded that "[a]lthough not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight." *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184-185 (1982). The judicial obligation is to satisfy the intention of the signatory parties, in construing the terms of a treaty. *Valentine v. United States*, 299 U.S. 5, 11 (1936) ("[I]t is our duty to interpret [the treaty] according to its terms. These must be fairly construed, but we cannot add or detract from them."). As discussed in *Sumitomo Shoji Am., Inc. v. Agagliano*, 457 U.S. at 185, a court's role is "limited to giving effect to the intent of the Treaty parties."

The UPOV Convention is silent on this particular issue. However, as noted above, Article 20(1) mandates that varietal denominations selected by the breeder are the equivalent of "generic designation[s]," and such designations must be available for free use by the public: [59]

> (1) [Designation of varieties by denominations; use of the denomination]
>
> > (a) The variety shall be designated by a denomination which will be its generic designation.
> >
> > (b) Each Contracting Party shall ensure that, subject to paragraph (4), no rights in the designation registered as the denomination of the variety shall hamper the free use of the denomination in

---

[59] UPOV Convention, Ch. VI ("Variety Denomination"), art. 20(1)(b), March 19, 1991, https://www.upov.int/edocs/pubdocs/en/upov_pub_221.pdf.

> connection with the variety, even after the expiration of the breeder's right.

We can extrapolate from the ordinary and legal meaning of "generic designation" that this encompasses all components, i.e. "key aspects or subcategory" of a varietal name, including the "prominent portion."

To further inform our decision, we look to the EXPLANATORY NOTES ON VARIETAL DENOMINATIONS UNDER THE UPOV CONVENTION adopted on September 21, 2021 ("EXPLANATORY NOTES") as an interpretative guide since[60] the stated objective of the EXPLANATORY NOTES is to foster uniform interpretation of the Convention amongst the contracting parties.[61] The Preamble reiterates the principle that "a variety denomination must be suitable as a generic designation and must enable the variety to be identified."[62] It then further explains that

> the main purpose of these Explanatory Notes is to ensure that, as far as possible, protected varieties are designated in all members of the Union by the same variety denomination, that the approved variety denominations establish themselves as the generic designations and that they are used in the offering for sale or marketing of propagating material of the variety, even after the expiration of the breeder's right.[63]

---

[60] "The Council considers that the adoption of such Explanatory Notes for the uniform interpretation and application of the provisions on variety denominations will be of assistance not only to the authorities of members of the Union but also to breeders in their selection of variety denominations." EXPLANATORY NOTES, Preamble, ¶ 6, September 21, 2021, https://www.upov.int/edocs/expndocs/en/upov_exn_den.pdf.

[61] *Id.*

[62] EXPLANATORY NOTES, Preamble, ¶ 2, September 21, 2021, https://www.upov.int/edocs/expndocs/en/upov_exn_den.pdf.

[63] EXPLANATORY NOTES, Preamble, ¶ 3, September 21, 2021, https://www.upov.int/edocs/expndocs/en/upov_exn_den.pdf.

The Preamble makes clear that the framers' intent is to ensure that varietal names are treated by the contracting parties as the legal equivalent of a generic designation. This includes portions thereof. Given this stated objective, the prominent portion of a varietal name cannot be registered as a trademark. To hold otherwise would breach U.S. obligations under the UPOV Convention.

### 2. Does the Record Show that IFG is a Prominent Portion of a Varietal Name for the Identified Goods?

With this holding in mind, we now turn to the question of whether Applicant's proposed mark IFG constitutes the "prominent portion" of the varietal names of record. To determine this issue, we look to *In re Delta & Pine Land Co., supra,* for guidance. That case also involved the question of determining which element constituted the prominent portion of several varietal names with a similar naming structure to the varietal names of record here, making it instructive to our analysis.

*In re Delta & Pine Land Co.* involved a refusal under Trademark Act Section 2(e)(1) to register DELTAPINE as merely descriptive of agricultural planting seeds. 26 USPQ2d at 1157. The record showed that Deltapine 50, Deltapine 20, Deltapine 105 and Deltapine 506 were the varietal names that the applicant had given to several varieties of cotton and soybean plants when it filed its applications to obtain PVP certificates with the Plant Variety Protection Office of the Department of Agriculture. *Id.* at 1158. In support of the refusal, the examining attorney argued that the applicant sought to register as a trademark "not just a portion of a varietal name but the dominant portion most likely to be remembered by the purchaser." *Delta & Pine Land*, 26 USPQ2d at 1158. The examining attorney emphasized that

granting the applicant a trademark registration for DELTAPINE "would allow it to have an unfair advantage over those who wish to produce the same seeds but would be precluded from calling the seeds deltapine seeds." *Id.* The Board, while acknowledging "that this is an unusual case and that little or no precedent exists," agreed, finding that DELTAPINE was "the prominent portion of various varietal names for plants or seeds…" *Id.* at 1158.

We agree with the reasoning from *In re Delta & Pine Land Co.* that "the dominant portion most likely to be remembered by the purchaser" constitutes "the prominent portion" of a varietal name. *See id.* Applying the same logic, we find that IGF is the dominant portion of the varietal names for Applicant's goods. Prospective consumers are more likely to remember this initial term and use it when calling for the goods. *Cf. Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1692 (Fed. Cir. 2005) (under the first *DuPont* factor in a likelihood of confusion analysis, prospective consumers are often more inclined to focus on the first word, prefix or syllable in any trademark or service mark); *Presto Prods. Inc. v. Nice-Pak Prods. Inc.,* 9 USPQ2d 1895, 1897 (TTAB 1988) (when comparing the similarity of marks in a likelihood of confusion analysis, "it is often the first part of a mark which is most likely to be impressed upon the mind of a purchaser and remembered"). The Federal Circuit's discussion in *Palm Bay* regarding the comparison marks under a likelihood of confusion analysis provides an apt analogy:

> To be sure, CLICQUOT is an important term in the mark,
> but VEUVE nevertheless remains a "prominent feature" as
> the first word in the mark and the first word to appear on
> the label. Not only is VEUVE prominent in the commercial

> impression created by VCP's marks, it also constitutes "the dominant feature" in the commercial impression created by Palm Bay's mark.

73 USPQ2d at 1692.

We also take into account "the fallibility of memory" of prospective consumers. *Cf. In re St. Helena Hosp.*, 774 F.3d 747, 113 USPQ2d 1082, 1085 (Fed. Cir. 2014) (quotation omitted) (the first *DuPont* factor in a likelihood of confusion analysis). The average consumer is unlikely to remember a specific numeral, making the subsequent numerical designations in each variety subordinate to IFG. In addition, from both a visual and auditory perspective, because they are last, they are less likely to be impressed upon a purchaser's memory and to be used in calling for the goods.

Another persuasive analogy for the varietal names of record comprised of IFG and numerical designations can be found in *In re Sansui Electric Co., Ltd.*, 194 USPQ 202 (TTAB 1977). In that case, registration was refused of the marks QSE and QSD on the ground that the depiction of the marks on the specimens of record as QSE-4 and QSD-4 constituted a mutilation. *Id.* at 203. The applicant argued that it used changeable model numbers with its marks "QSE" and "QSD" to designate the successive generations of its equipment. The Board reversed the refusal, finding that

> the designations "QSE" and "QSD" per se create a commercial impression separate and apart from the series of model numbers in association with which they are used; that it is in fact these letter designations which truly serve as indications of origin, i.e., as trademarks, for applicant's goods, while the various changing numbers serve simply as model designations to identify and distinguish, one from another, the successive generations of applicant's equipment…

*Id.* Similarly, the initial letter designation IFG will make more of an impression with breeders and other consumers of Applicant's goods, while the subsequent numerical designations are more akin to various changing "model numbers," making them subordinate to IFG.

With regard to the varietal denominations comprised of "Cher" hyphenated with a numerical designation such as "IGF Cher-seven," our finding is the same. As with the other varietal names, each of these names commence with IFG. Consumers are likely to perceive "Cher" as the shortened form of "cherry," which is highly suggestive of the named tree or fruit. As a result, consumers are less likely to focus on the "Cher" suffix, and more likely to focus on IFG as an arbitrary component of the varietal name.

Our determination that IGF constitutes the "prominent portion" of each varietal name is consistent with U.S. obligations under the UPOV Convention. As noted above, a breeder cannot select a varietal name consisting solely of numbers except where this is an established practice for designating varieties.[64] To find that the subsequent number in each varietal name constitutes the "prominent portion" would undermine this general principle.

In view of the foregoing, we find that IFG is the dominant element of the varietal names of record for the identified goods. Consumers are likely to focus on the initial

---

[64] UPOV Convention, Ch. VI ("Variety Denomination"), art. 20(2), March 19, 1991, https://www.upov.int/edocs/pubdocs/en/upov_pub_221.pdf.

letter string "I-F-G" and pronounce it as such in calling for the goods. We therefore find that IFG constitutes the "prominent portion" of each varietal name.

### 3. Does Applicant's Prior Valid and Subsisting Trademark Registration Overcome the Varietal Name Refusal?

Having determined that that IFG is the prominent portion of the varietal names of record for the identified goods, we are left with the question of whether Applicant can register IFG as a trademark for "Fresh fruits and vegetables; live plants; live trees; live grape vines; live plant material, namely, live grape vine material, live plant material and live tree material," in light of its prior registration of IFG on the Principal Register for "Live plants, namely, table grape vines, cherry trees" and purported trademark use.

The fact that Applicant owns a valid and subsisting trademark registration consisting solely of the term IFG for in-part identical goods does not alter the outcome. As Applicant states, and as shown by the record, it filed the application underlying its trademark Registration No. 3771967 for the standard character mark IFG on the Principal Register for "Live plants, namely, table grape vines, cherry trees" in International Class 31 prior to filing or obtaining plant patent and PVP protection for any of the new varietals it developed.[65] Applicant, through its predecessor in interest, selected varietal denominations comprised of IFG as the initial term when it subsequently filed its applications for plant patent protection with the USPTO and PVP protection with the Plant Variety Protection Office. As the

---

[65] As noted inter alia, the registration registered on April 6, 2010 based on an application filed November 7, 2006.

creator and inventor of these new varietals, Applicant had the latitude to create and choose any names as their denominations, so long as the designated nomenclature conformed with U.S. law and regulations governing Plant patent and PVP examination before the USPTO and PVPO of the Department of Agriculture, and U.S. obligations under the UPOV Convention. The varietal denominations bearing IFG as the prominent portion for the identified goods have been publicized to consumers via Applicant's plant patents and PVP certificates bearing IFG as the prominent portion. Thus, when a purchaser asks for any of Applicant's patented or PVP protected goods, it "has no other name to use but its designated name." *Pennington Seed*, 80 USPQ2d at 1762. Applicant could have chosen a designation other than IFG to associate as a brand name and file for trademark protection. Instead, cognizant that such varietal denominations would eventually become the generic designations upon the expiration of plant patent and PVP certificate protection,[66] Applicant risked the integrity of its IFG trademark by using IFG to name new varietals. Applicant cannot now inhibit current and future public use of these varietal denominations because of its decision-making.

Moreover, Applicant's reliance on *In re Delta & Pine Land Co.,* is misplaced. The language that Applicant points to regarding distinctiveness is dicta and not controlling. We further observe, the refusal of the mark DELTAPINE was issued under Section 2(e)(1) as merely descriptive. Since issuance of the opinion in 1993, as

---

[66] *See* 37 C.F.R. § § 1.163(c)(4) and (5) and MPEP §§ 1605 and 1613; *see also* UPOV Convention, Ch. VI ("Variety Denomination"), art. 20(1)(a) and art. 20(1)(b), March 19, 1991, https://www.upov.int/edocs/pubdocs/en/upov_pub_221.pdf.

set forth in Section 1202.02 of the TMEP, the USPTO's practice has evolved to include failure to function refusals under Trademark Act Sections 1, 2, and 45 of marks comprised of the prominent portion of a varietal name. The purpose of including the citation in the TMEP to *In re Delta & Pine Land Co.* is simply to provide guidance on determining which element of a proposed mark constitutes the prominent portion of a varietal name. As explained above, a mark comprised of a prominent portion of a varietal name cannot function as a source indicator.

With regard to Applicant's arguments regarding prior and current common law usage of IFG as a trademark and house mark for its goods and services and any purported brand name recognition, such arguments necessarily fail. As explained above, a failure to function refusal under Trademark Act Sections 1, 2, and 45 because the designation is a varietal name is an absolute bar to registration, meaning that the refusal cannot be overcome with evidence of distinctiveness. Applicant's assertion that its prior trademark registration is incontestable and immune from refusal as a generic term simply is not true, given that genericness claims are not time barred in Board cancellation proceedings and can be brought "**any time the mark becomes the generic name of the goods**… ." *See* Trademark Act Section 14(3), 15 U.S.C. § 1064(3) (emphasis added). *See also Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 224 USPQ 327, 329 (1985) ("A registered mark may be canceled at any time on the ground that it has become generic."); and *In re Cordua Rests., Inc.*, 823 F.3d 594, 118 USPQ2d 1632, 1634 (Fed. Cir. 2016) ("even if [applicant's] earlier registration [of the CHURRASCOS word mark] were incontestable, incontestability

is irrelevant to the question of genericness."). And even if Applicant's arguments regarding actual use were convincing, we have no credible evidence of prior use in the form of declarations or affidavits from a witness with personal knowledge in the record. Rather, we only have the assertions of Applicant's counsel in its brief. Although "the Board does not, in ex parte appeals, strictly apply the Federal Rules of Evidence, as it does in inter partes proceedings," *In re Sela Prods. LLC*, 107 USPQ2d 1580, 1584 (TTAB 2013), we cannot equate counsel's arguments as evidence of use. *See Cai v. Diamond Hong, Inc.*, 901 F.3d 1367, 127 USPQ2d 1797, 1799 (Fed. Cir. 2018) (quoting *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 424 F.3d 1276, 1284 (Fed. Cir. 2005) ("Attorney argument is no substitute for evidence.")).

Our holding that the prominent portion of a varietal name fails to function as a mark and is unregistrable under Trademark Act Sections 1, 2 and 45, even where that prominent portion has been registered as a trademark, is consistent with U.S. obligations under the UPOV Convention. Applicant implies otherwise by arguing that because it is in full compliance with the UPOV Convention and in particular by selecting varietal names combined with IFG and other matter it cannot be denied a trademark registration for the mark IFG standing alone for the identified goods. We disagree. Applicant's decision to select a previously registered and used trademark as a prominent portion of the varietal names for the new and distinct varietals it created runs contrary not only to the spirit of the Convention but the text as well.

As explained above the only provision explicitly referring to trademarks in the main text of the UPOV Convention is found in Article 20(8) which permits

trademarks to be associated with new and distinct varietals so long as the varietal denominations are recognizable.[67] However, as noted earlier, Article 20(1) provides that the chosen varietal denomination for new and distinct varietals "will be its generic designation,"[68] and that "no rights in the designation registered as the denomination of the variety shall hamper the free use of the denomination in connection with the variety, even after the expiration of the breeder's right."[69] Because the term "rights" is ambiguous, we again look to the EXPLANATORY NOTES for guidance. EXPLANATORY NOTE Paragraph (1)[70] makes clear that previously registered and used trademarks may be transformed into generic terms if used as the varietal designation for a new and distinct varietal:

> 1.1 Article 5(2) of the 1991 Act and Article 6(1)(e) of the 1978 Act and the 1961 Convention require that the variety is designated by a denomination. **Paragraph (1) provides for the denomination to be the generic designation of the variety, and subject to prior rights, no rights in the designation shall hamper the free use of the denomination of the variety, even after the expiration of the breeder's right.** The obligation under paragraph (1) should be considered together with the obligation to use the variety denomination in respect of the offering for sale or

---

[67] UPOV Convention, Ch. VI ("Variety Denomination"), art. 20(8), March 19, 1991, https://www.upov.int/edocs/pubdocs/en/upov_pub_221.pdf.

[68] UPOV Convention, Ch. VI ("Variety Denomination"), art. 20(1)(a), March 19, 1991, https://www.upov.int/edocs/pubdocs/en/upov_pub_221.pdf.

[69] UPOV Convention, Ch. VI ("Variety Denomination"), art. 20(1)(b), March 19, 1991, https://www.upov.int/edocs/pubdocs/en/upov_pub_221.pdf.

[70] "The Explanatory Notes below correspond to the paragraph numbers within Article 20 of the 1991 Act and Article 13 of the 1978 Act and 1961 Convention, unless indicated otherwise." https://www.upov.int/edocs/expndocs/en/upov_exn_den.pdf.

marketing of propagating material of the variety (see paragraph (7)).

1.2    The obligation under paragraph (1) to allow for the use of the denomination in connection with the variety, even after the expiration of the breeder's right, is of relevance if the breeder of the variety is also the holder of a trademark which is identical to the variety denomination. **It should be noted that where a name is registered as a trademark by a trademark authority, the use of the name as a variety denomination may transform the trademark into a generic name. In such cases, the trademark may become liable for cancellation.**

(Emphasis added.) The EXPLANATORY NOTE references the following from WIPO Publication No. 489 "WIPO Intellectual Property Handbook Proper Use of Trademarks":

2.397 Non-use can lead to the loss of trademark rights. Improper use can have the same result, however. **A mark may become liable for removal from the Register if the registered owner has provoked** or tolerated **its transformation into a generic name for one or more of the goods or services in respect of which the mark is registered, so that, in trade circles and in the eyes of the appropriate consumers and of the public in general, its significance as a mark has been lost.**

For these reasons, Applicant's interpretation of the UPOV Convention defeats the stated purpose of providing a uniform standard for the naming of new and distinct varietals and their free use upon expiration of intellectual property rights.

This brings us to Applicant's concern that when Applicant's plant patent and PVP certificate protection expires, it will lose the ability to prevent unrelated third parties from using those plant patent varietal names. It is this precise inability to maintain a monopoly that is the underpinning of U.S. patent law. By granting the developer of

new varietals a limited exclusive right to market and sell new and distinct varietals, U.S. patent law rewards innovation and creativity. Such a monopoly, however, was never intended to remain permanent.[71] Because IFG is the prominent portion for the varietal names of the identified goods, purchasers have no other option but to refer to the goods in this manner.

Applicant seeks to preserve in perpetuity the fruit of its inventions and exclusive right to IFG through the trademark registration process. If permitted, this would impede free use in the marketplace of a varietal denomination following the expiration of plant patent and PVP certificate rights. For this reason, we share the Examining Attorney's public policy concern that allowance of IFG as a trademark would amount to an improper extension of Applicant's plant patent and PVP certificate rights under U.S. law. *See Pennington Seed*, 80 USPQ2d at 1058 ("When an applicant seeks protection of its grass seed, the applicant is required to name its developed variety. Applicant here decided to name its variety of grass seed 'Rebel' and that name was disclosed in the PVP certificate, designating to the public the name of the variety of grass seed."). By making a deliberate decision to select IFG as the prominent portion of the varietal names of the identified goods, Applicant self-

---

[71] The Constitution of the United States provides:

> Art. 1, Sec. 8. The Congress shall have Power . . . To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries.

abrogated its own trademark rights, exposing its prior trademark registration to potential cancellation in an inter partes proceeding.[72]

## IV. Conclusion

In summary, we hold that proposed marks that constitute the prominent portion of a varietal denomination are unregistrable under Trademark Act Sections 1, 2, and 45 because they are generic for the varietals they identify. Insofar as we have found that IFG is the prominent portion of the varietal names of record, for the goods identified as "Fresh fruits and vegetables; live plants; live trees; live grape vines; live plant material, namely, live grape vine material, live plant material and live tree material" in International Class 31, IFG is incapable of functioning as a trademark.

**Decision**: The refusal to register Applicant's mark is affirmed.

---

[72] To reiterate, Trademark Act Section 14(3), 15 U.S.C. § 1064(3), permits a petition to cancel to be filed at any time on ground that the registered mark is generic of the identified goods or services.

# APPENDIX I







# APPENDIX II









Serial No. 88711192

# APPENDIX III

Ad by CRITEO

Report this ad

Ad choices ▷



## Patents Assigned to International Fruit Genetics, LLC

**Sweet cherry tree named 'IFG Cher-seven'**
**Patent number:** PP30261
**Abstract:** This invention is a new and distinct sweet cherry tree variety denominated 'IFG Cher-seven'. The new sweet cherry tree is characterized by producing large size dark red fruits having reniform shape and ripening in mid-season. The eating quality remains good after 40 days of cold storage. The fruit stems of 'IFG Cher-seven' remain green, have fresh appearance and have excellent attachment after 40 days of storage.
**Type:** Grant
**Filed:** May 22, 2017
**Date of Patent:** March 5, 2019
**Assignee:** INTERNATIONAL FRUIT GENETICS, LLC
**Inventor:** David Cain

**Grapevine plant 'IFG Thirty-four'**
**Patent number:** PP30325
**Abstract:** This invention is a new and distinct grapevine variety denominated 'IFG Thirty-four'. The new grapevine plant is characterized by producing small naturally seedless reddish black to black berries having round shape with a strong concord-like labrusca flavor. Fruits are medium in acidity, with a very soft juicy texture and have excellent eating quality.
**Type:** Grant
**Filed:** December 18, 2017
**Date of Patent:** April 2, 2019
**Assignee:** INTERNATIONAL FRUIT GENETICS, LLC
**Inventor:** David Cain

**Grapevine named 'IFG Thirty'**
**Patent number:** PP30424
**Abstract:** This invention is a new and distinct grapevine variety denominated 'IFG Thirty'. The new grapevine 'IFG Thirty' is characterized by producing naturally large, ovate to elongated ovate, black seedless berries which are firm in texture, medium low in acidity and ripen late in the growing season.
**Type:** Grant
**Filed:** October 10, 2017
**Date of Patent:** April 23, 2019
**Assignee:** INTERNATIONAL FRUIT GENETICS, LLC
**Inventor:** David Cain

**Sweet cherry tree named 'IFG Cher-five'**
**Patent number:** PP30661
**Abstract:** This invention is a new and distinct sweet cherry tree denominated 'IFG Cher-five'. The new sweet cherry tree is characterized by producing large size dark red fruits having flat-round shape. Fruits ripen early about Apr. 25, 2014 in Delano Calif. The 'IFG Cher-five' has firm, medium acid fruit with an excellent cherry flavor. Fruits are tolerant of rain induced cracking, and high temperature induced doubling.
**Type:** Grant
**Filed:** February 28, 2017
**Date of Patent:** July 9, 2019
**Assignee:** INTERNATIONAL FRUIT GENETICS, LLC
**Inventor:** David Cain

**Grapevine plant named 'IFG Thirty-seven'**

*- 44 -*

Serial No. 88711192

**Patent number:** PP30663

**Abstract:** This invention is a new and distinct grapevine variety denominated 'IFG Thirty-seven'. The new grapevine is characterized by producing naturally large seedless red berries having a broad ellipsoidal shape with a mild labrusca flavor. Fruits have medium firm texture and have excellent eating quality. Berries color readily even in hot climatic conditions and produce completely colored red berries. Vines are productive and can be pruned to short spurs. Berries are borne on large, loose but well filled clusters that do not require any additional thinning.

**Type:** Grant

**Filed:** February 5, 2018

**Date of Patent:** July 9, 2019

**Assignee:** International Fruit Genetics, LLC

**Inventor:** David Cain

Sweet cherry tree named 'IFG Cher-four'

**Patent number:** PP30704

**Abstract:** This invention is a new and distinct sweet cherry tree denominated 'IFG Cher-four'. The new sweet cherry tree is characterized by producing medium size blushed fruits having flat-round shape. Fruits ripen early, about Apr. 26, 2014 in Delano Calif. The 'IFG Cher-four' has medium firm, medium acid fruit with a good cherry flavor. Fruits are tolerant of rain induced cracking. The sweet cherry tree has a medium low chilling requirement, about 300 to 400 chill hours.

**Type:** Grant

**Filed:** February 15, 2017

**Date of Patent:** July 16, 2019

**Assignee:** INTERNATIONAL FRUIT GENETICS, LLC

**Inventor:** David Cain

Grapevine plant named 'IFG Thirty-six'

**Patent number:** PP30705

**Abstract:** This invention is a new and distinct grapevine variety denominated 'IFG Thirty-six'. The new grapevine is characterized by producing naturally large seedless black berries having a broad ellipsoidal shape with a strong spicy concord-like labrusca flavor. Fruits are medium in acidity, with a firm texture and have excellent eating quality. Berries color readily even in hot climatic conditions and produce completely colored black berries. Vines are productive and can be pruned to short spurs.

**Type:** Grant

**Filed:** February 5, 2018

**Date of Patent:** July 16, 2019

**Assignee:** International Fruit Genetics, LLC

**Inventor:** David Cain

Grapevine 'IFG Thirty-five'

**Patent number:** PP30706

**Abstract:** This invention is a new and distinct grapevine variety denominated 'IFG Thirty-five'. The new grapevine is characterized by producing naturally large size elliptic seedless berries having a strong muscat flavor, very thin skin and which ripens in mid-season. Berries are borne on medium size clusters which may require low rates of gibberellin to thin.

**Type:** Grant

**Filed:** February 26, 2018

**Date of Patent:** July 16, 2019

**Assignee:** INTERNATIONAL FRUIT GENETICS, LLC

**Inventor:** David Cain

Grapevine plant named 'IFG Thirty-two'

**Patent number:** PP31147

**Abstract:** This invention is a new and distinct grapevine variety denominated 'IFG Thirty-two'. The new grapevine plant is characterized by producing medium size finger shaped berries having medium firm texture with a neutral flavor and which ripen in mid-season. Berries are borne on medium size clusters which are naturally loose and do not require gibberellin applications to thin clusters.

**Type:** Grant

**Filed:** December 15, 2017

**Date of Patent:** December 3, 2019

**Assignee:** International Fruit Genetics, LLC

**Inventor:** David Cain

Grapevine plant named 'IFG Forty'

**Patent number:** PP31506

**Abstract:** This invention is a new and distinct grapevine variety denominated 'IFG Forty'. The new grapevine is characterized by producing naturally large seedless black berries having an elliptic shape with a mild labrusca flavor. Fruits are medium in acidity, with a firm texture and have excellent eating quality.

**Type:** Grant

**Filed:** March 4, 2019

*- 45 -*

Serial No. 88711192

**Date of Patent:** March 3, 2020
**Assignee:** International Fruit Genetics, LLC
**Inventor:** David Cain

**Grapevine named 'IFG Twenty-five'**
**Patent number:** PP31717
**Abstract:** This invention is a new and distinct grapevine variety denominated 'IFG Twenty-five'. The new grapevine is characterized by producing small to medium size elliptic full black berries having medium firm texture with a neutral flavor and which ripen in early season. Berries are borne on medium size clusters which are slightly compact and may require gibberellin applications to thin clusters and size berries.
**Type:** Grant
**Filed:** December 7, 2016
**Date of Patent:** May 5, 2020
**Assignee:** INTERNATIONAL FRUIT GENETICS, LLC
**Inventor:** David Cain

**Grapevine plant named 'IFG Forty-three'**
**Patent number:** PP31718
**Abstract:** This invention is a new and distinct grapevine variety denominated 'IFG Forty-three'. The new grapevine is characterized by producing medium size obtuse ovate shaped berries having medium firm texture, and which ripen very early in the season. Berries resist flesh browning and bruising. Berries are borne on medium size clusters which are naturally loose and do not require gibberellin applications to thin clusters.
**Type:** Grant
**Filed:** April 16, 2019
**Date of Patent:** May 5, 2020
**Assignee:** INTERNATIONAL FRUIT GENETICS, LLC
**Inventor:** David Cain

**Grapevine plant named 'IFG Forty-two'**
**Patent number:** PP31746
**Abstract:** This invention is a new and distinct grapevine variety denominated 'IFG Forty-two'. The new grapevine is characterized by producing naturally large size narrow ellipsoid seedless green berries having an extremely crisp texture, thin skin and which ripen in mid-season. Berries are borne on medium size clusters which are naturally loose and do not require gibberellin to thin.
**Type:** Grant
**Filed:** April 9, 2019
**Date of Patent:** May 12, 2020
**Assignee:** INTERNATIONAL FRUIT GENETICS, LLC
**Inventor:** David Cain

**Grapevine plant named 'IFG Forty-one'**
**Patent number:** PP31771
**Abstract:** This invention is a new and distinct grapevine variety denominated 'IFG Forty-one'. The new grapevine is characterized by producing small naturally seedless red berries having a broad ellipsoid shape with a unique combination of muscat and labrusca flavor. The strong fruity flavor is reminiscent of strawberries. Fruits normally ripen mid-season.
**Type:** Grant
**Filed:** April 9, 2019
**Date of Patent:** May 19, 2020
**Assignee:** INTERNATIONAL FRUIT GENETICS, LLC
**Inventor:** David Cain

**Sweet cherry tree named 'IFG Cher-nine'**
**Patent number:** PP32188
**Abstract:** This invention is a new and distinct sweet cherry tree denominated 'IFG Cher-nine'. The new sweet cherry tree is characterized by producing early ripening medium size dark red fruits having a reniform shape. Fruits ripen early and are very firm, with medium acid fruit with a good cherry flavor. Fruits are tolerant of rain induced cracking. The tree has a low chilling requirement of about 300 to 400 hours. It produces few doubled and spurred fruits.
**Type:** Grant
**Filed:** November 14, 2019
**Date of Patent:** September 15, 2020
**Assignee:** INTERNATIONAL FRUIT GENETICS, LLC
**Inventor:** David Cain

**Grapevine plant named 'IFG Thirty-nine'**
**Patent number:** PP32270
**Abstract:** This invention is a new and distinct grapevine variety denominated 'IFG Thirty-nine'. The new grapevine is characterized by producing medium size narrow finger shaped yellow-green berries having medium firm texture with a muscat flavor and which ripen in mid-season. Berries are borne on medium size

*- 46 -*

Serial No. 88711192

clusters which are naturally loose and do not require gibberellin applications to thin clusters.
**Type:** Grant
**Filed:** December 26, 2018
**Date of Patent:** October 6, 2020
**Assignee:** INTERNATIONAL FRUIT GENETICS, LLC
**Inventor:** David Cain

**Grapevine plant named 'IFG Thirty-eight'**
**Patent number:** PP32304
**Abstract:** This invention is a new and distinct grapevine variety denominated 'IFG Thirty-eight'. The new grapevine is characterized by producing medium size round white berries having crisp texture with a very strong muscat flavor and which ripens in midseason. Berries are borne on medium size clusters which are compact.
**Type:** Grant
**Filed:** December 21, 2018
**Date of Patent:** October 13, 2020
**Assignee:** INTERNATIONAL FRUIT GENETICS, LLC
**Inventor:** David Cain

**Sweet cherry tree named 'IFG Cher-ten'**
**Patent number:** PP32576
**Abstract:** This invention is a new and distinct sweet cherry variety denominated 'IFG Cher-ten'. The new sweet cherry tree is characterized by producing large size, dark red fruits having reniform shape. Fruits ripen early, are firm with medium acidity and have a good cherry flavor. Fruit stems are long, medium thick, have strong attachment and stay green during storage and shipping. 'IFG Cher-ten' is self-incompatible having S1S3 pollen alleles. The tree has a medium-low chilling requirement of about 400 to 500 hours. It produces very few doubled and spurred fruits in high summer temperature regions.
**Type:** Grant
**Filed:** April 6, 2020
**Date of Patent:** December 8, 2020
**Assignee:** INTERNATIONAL FRUIT GENETICS, LLC
**Inventor:** David Cain

**Grapevine plant named 'IFG Forty-four'**
**Patent number:** PP33069
**Abstract:** This invention is a new and distinct grapevine variety denominated 'IFG Forty-four'. The new grapevine is characterized by producing small naturally seedless reddish black berries having an ellipsoid shape with a Concord like labrusca flavor. Fruits normally ripen early-season, about mid to late July near Delano Calif. Fruits are fairly low in acidity, with a soft to slightly firm texture. Berries color readily even in hot climatic conditions and produce completely colored dark reddish black berries. Vines are very productive and can be pruned to short spurs.
**Type:** Grant
**Filed:** June 19, 2019
**Date of Patent:** May 18, 2021
**Assignee:** International Fruit Genetics, LLC
**Inventor:** David Cain

**Grapevine plant named 'IFG Forty-five'**
**Patent number:** PP33089
**Abstract:** This invention is a new and distinct grapevine variety denominated 'IFG Forty-five'. The new grapevine is characterized by producing naturally large, broad ellipsoidal, completely black seedless berries which are firm in texture and ripen early in the growing season. Fruits normally ripen in late July to early August near Delano, Calif.
**Type:** Grant
**Filed:** November 21, 2019
**Date of Patent:** May 25, 2021
**Assignee:** International Fruit Genetics, LLC
**Inventor:** David Cain

1   2   3   4   **NEXT**

*- 47 -*